13-2894-cr (L)
United States of America v. Prado

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

August Term, 2015

(Argued: December 9, 2015                    Decided:  February 24, 2016)

Docket Nos. 13-2894-cr (L), 13-3877-cr (Con), 14-115-cr (Con), 14-143-cr (Con)

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.

GIOVANNI PRADO, aka JOKER, ERICK ALVARADO, aka GATO SECO, ELENILSON ORTIZ, aka SHORTY, EFRAIN ZUNIGA, aka PANICO, DIEGO NINOS, aka VENENO, aka MICO, SERGIO MEJIA-BARRERA, aka PELON, EMILIO SABALLOS, aka CABALLO, WALTER FLORES-REYES, aka SCRAPPY, aka WALTER REYES, DAVID VALLE, aka OREO, LOUIS RUIZ, aka CHUCKY, aka LUIS RUIZ, FRANCISCO RAMOS, aka CRUISER,  CESAR LANDAVERDE, aka FLACO, aka REBELDE, ROGER ALVARADO, aka MICHICHI, CARLOS MARTINEZ, aka CARLITO, JOSE GUSTAVO ORELLANA-TORRES, aka DIABLITO, aka GUSTAVO JEFFERSON ORELLANA TORRES, JIMMY SOSA, aka JUNIOR, JEREMIAS EXEQUIEL AMAYA, aka PAYASO, JOSE SALAZAR ERAZO, aka JOSE SALAZAR ERZAO, FRANKLIN VILLATORO, aka MONSTRO, WILBER AYALA-ARDON, aka PAJARO, aka PIOLIN, YOBANY CALDERON, aka TEGO, ADALBERTO ARIEL GUZMAN, aka GRINGO, RENE MENDEZ MEJIA, aka ZORRO, YONIS ACOSTA-YANES, aka BRUJITA,

*Defendants*,

VIDAL ESPINAL, aka DEMENTE, MARIO ALPHONSO HERRERA-UMANZOR, aka PERDIDO, aka MARIO UMANZOR, HERIBERTO MARTINEZ, aka BOXER, CARLOS ORTEGA, aka SILENCIO,

*Defendants-Appellants*.[1]

_____

Before: CALABRESI, POOLER, and LYNCH, *Circuit Judges*.

Appeal from United States District Court for the Eastern District of New York (Joseph F. Bianco, *J.*) convicting defendant-appellant Heriberto Martinez, aka Boxer, of fourteen counts related to racketeering activity and three murders in aid of racketeering and convicting defendant-appellant Carlos Ortega, aka Silencio, of twelve counts related to racketeering activity and two murders and one attempted murder in aid of racketeering, following a jury trial. In particular, both defendants were convicted of Count 21, which charged that they "knowingly and intentionally use[d] and carr[ied] a firearm during and in relation to one or more crimes of violence, to wit:" the murder of and conspiracy to murder Mario Alberto Canton Quijada "charged in Counts Nineteen and Twenty, and did knowingly and intentionally possess said firearm in furtherance

---

[1] The Clerk of Court is directed to amend the caption as set forth above.

2

of such crimes of violence," or that they aided and abetted that crime. Ortega App'x at 35-36. Because the jury instructions on Count 21 were plainly erroneous and Ortega's substantial rights were affected, we vacate his conviction on Count 21, and remand for resentencing. Although the instructions were also plainly erroneous as to Martinez, his substantial rights were not affected, and we therefore affirm his conviction on Count 21. In a summary order issued simultaneously with this opinion, we affirm Martinez's and Ortega's remaining counts of conviction; we grant counsel for defendant-appellant Vidal Espinal's motion to be relieved, dismiss Espinal's appeal of his conviction and term of imprisonment, and affirm his special assessment and term of supervised release; and we grant counsel for Mario Alphonso Herrera-Umanzor's motion to be relieved and we affirm the judgment against Herrera-Umanzor.

The judgment against Martinez is affirmed. The judgment against Ortega is vacated in part and affirmed in part, and we remand for resentencing.

_____

3

ROBERT A. SOLOWAY, Rothman, Schneider, Soloway & Stern, LLP, New York, NY, *for Defendant-Appellant Mario Alphonso Herrera-Umanzor*.

JOHN FREDERICK CARMAN, Garden City, NY, *for Defendant-Appellant Vidal Espinal*.

RANDALL D. UNGER, Bayside, NY (Elizabeth E. Macedonio, New York, NY, *on the brief*), *for Defendant-Appellant Heriberto Martinez*.

ELIZABETH M. JOHNSON (Ira D. London and Avrom Robin *on the brief*), Law Offices of London & Robin, New York, NY, *for Defendant-Appellant Carlos Ortega*.

JOHN J. DURHAM, Assistant United States Attorney (Carrie N. Capwell, Peter A. Norling, and Raymond A. Tierney, Assistant United States Attorneys, *on the brief*), *for* Kelly T. Currie, Acting United States Attorney for the Eastern District of New York, Brooklyn, NY, *for Appellee*.

POOLER, *Circuit Judge*:

This appeal concerns the jury instructions given with respect to Count 21 of the indictment, which charged defendants-appellants Heriberto Martinez, aka Boxer, and Carlos Ortega, aka Silencio, with aiding and abetting a violation of 18 U.S.C. § 924(c), using or carrying a firearm in relation to a crime of violence or possessing a firearm in furtherance of that crime, in connection with the murder

4

of Mario Alberto Canton Quijada. We hold that, in the wake of *Rosemond v. United States*, 134 S. Ct. 1240 (2014), general instructions on aiding and abetting liability, such as the instructions given below, are insufficient and plainly erroneous in the context of a § 924(c) charge. We further hold that this error affected Ortega's, but not Martinez's, substantial rights, and we therefore vacate Ortega's conviction on Count 21.

## BACKGROUND

**I.     The Offense Conduct**

Martinez and Ortega were members of La Mara Salvatrucha, also known as MS-13, which is a violent international street gang. Martinez was the leader of the Coronados Locos Salvatruchas ("CLS"), a clique, or subgroup, of MS-13 that controlled the Brentwood area of Long Island. Ortega belonged to an MS-13 clique called Sitios Locos Salvatruchas ("STLS"), which is based in El Salvador.

Martinez was indicted on fourteen counts related to racketeering activity and three murders committed in aid of racketeering; Ortega was indicted on twelve counts related to racketeering activity, two murders, and one attempted murder committed in aid of racketeering. Following a jury trial, both defendants

were convicted of every count with which they were charged. As is relevant here, Martinez and Ortega were both convicted of Count 21, which charged them with knowingly and intentionally using and carrying a firearm in relation to the murder of Quijada, or aiding and abetting the same, under 18 U.S.C. § 924(c) and 18 U.S.C. § 2. Each defendant was sentenced to life plus a consecutive 60 years; 25 of those additional 60 years were allocated, as required by 18 U.S.C. § 924(c)(1)(C)(i), to their convictions on Count 21.

The evidence presented at trial as to Count 21 and the murder of Quijada was as follows. On March 16, 2010, a group of MS-13 members, including Martinez and Ortega, met at the home of Jeremias Amaya, aka Payaso, to discuss Quijada, aka Baby Blue. Quijada was also a member of MS-13, specifically the Surenos Locos Salvatruchas ("SLS") clique. The group discussed that Quijada "wasn't running properly," that he "was no good for the Mara because he only caused problems," and that he "only caused problems and never solved a thing." Tr. at 1223-24. Because of these problems, the MS-13 members present decided that they would require Quijada to kill a rival gang member to prove himself.

6

Thereafter, a group of MS-13 members, including Ortega, picked up Quijada. There is conflicting testimony as to whether Martinez also accompanied the group on this "mission." They drove around looking for rival gang members for Quijada to kill, but were unable to find any. Quijada was dropped off at home and the rest of the group returned to Amaya's home. There, Ortega "said that he had wanted to give [Quijada] the gun, but [Quijada] didn't want to pick it up." Tr. at 1776. According to one cooperating witness, upon returning, the group, including Ortega and Martinez, discussed that Quijada "had to be eliminated," meaning "[k]ill[ed]," because he "only brought or caused problems and . . . he was not there to help the [gang]." Tr. at 1227. According to that witness, the group then took a vote, and unanimously voted to pick Quijada up and kill him. Another cooperating witness testified that Ortega said they had to kill Quijada, and Martinez stated that he agreed because if Quijada were arrested he would snitch. By contrast, the testimony of a third cooperating witness, who was not present at that meeting, indicated that the decision to murder Quijada was not made until immediately before the murder. Specifically, he testified that shortly after the murder of Quijada, Ortega told him that when Quijada refused

7

to commit a murder on behalf of the gang, they "had a quick meeting and they had decided to give him a calenton," Tr. at 406, a beating the gang uses for initiation and punishment. But, Ortega told him, "when they started giving him the calenton they decided to shoot him" instead. Tr. at 406.

Following that meeting, one of the MS-13 members present called Quijada and told him that they were coming to pick him up because they had found some rival gang members. A group of five MS-13 members, including both Martinez and Ortega, then went to pick up Quijada. The group left Amaya's house, and then spent approximately ten to fifteen minutes in the parking lot outside before going to get Quijada. A cooperating witness testified that he could see the car sitting in the parking lot from the apartment he was in. He stated, "I don't know what they were doing. I think they were loading the gun." Tr. at 1778. When police later searched the car, officers found a bag containing dozens of bullets.

The group went to get Quijada, and brought him to the beach. According to one cooperating witness, before leaving for the beach, Martinez grabbed a machete that was in Amaya's house. At the beach, Amaya took out a gun to shoot Quijada, but the gun jammed. Amaya handed the gun to Martinez, and

8

Martinez gave Amaya the machete, which Amaya then used to stab Quijada. Amaya told one cooperating witness that, while he was stabbing Quijada, the other MS-13 members present were supporting him. Another MS-13 member then stabbed Quijada with a kitchen knife. Quijada was ultimately stabbed to death. Additionally, Martinez gave a statement to police on March 17, 2010, the day after the murder, stating that, after the gun failed, they used a machete and a knife to murder Quijada and that he had brought the machete to the beach. Martinez further stated that after the gun jammed, he hit Quijada with the machete at one point, and that he kicked Quijada so that he fell and was not able to get away. By contrast, there is no evidence that Ortega participated in the assault on and murder of Quijada after the gun appeared.

Finally, there was evidence that the gun Amaya tried to shoot Quijada with, a .22 caliber gun, was the same gun Ortega had tried to give Quijada earlier that night. There was also evidence that that gun belonged to Martinez's clique.

## II.    Count 21

### A.    The Charge

Count 21 charged Martinez and Ortega with brandishing a firearm during a crime of violence in connection with the murder of Quijada. The indictment charged them with 18 U.S.C. § 924(c)(1)(A)(ii), (c)(1)(C) and 18 U.S.C. § 2. The charged provisions of 18 U.S.C. § 924(c) provide that

> any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime-- . . . if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years . . . . In the case of a second or subsequent conviction under this subsection, the person shall-- . . . be sentenced to a term of imprisonment of not less than 25 years . . . .

18 U.S.C. § 924(c)(1)(A)(ii), (c)(1)(C). And 18 U.S.C. § 2(a), the federal aiding and abetting statute, provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

10

**B.     The Jury Instructions**

The district court first gave the jury a general instruction on aiding and abetting liability:

> Certain counts charge the defendants with violating the "aiding and abetting statute." The federal definition of "aiding and abetting" is contained in section two of Title 18 of the United States Code, which provides – I'm now reading from the statement [sic]:
>
> A. Whoever commits an offense . . . or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
>
> B. Whoever willfully causes an act to be done, which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
>
> Under this statute, it is not necessary for the Government to show that the defendant himself physically committed the crime with which he is charged in order for you to find him guilty. This is because under the law, a person who aids or abets another to commit an offense is just as guilty of that offense as if he committed it himself.
>
> Before a defendant may be held responsible for aiding and abetting others in the commission of a crime, it is necessary that the Government prove beyond a reasonable doubt that the defendant knowingly and deliberately associated himself in some way with the crime charged and participated in it with the intent to commit the crime.

11

In order to be found guilty of aiding and abetting the commission of a crime, the Government must prove beyond a reasonable doubt that the defendant:

First, knew that the crime charged was to be committed or was being committed;

Second, knowingly did some act for the purpose of aiding, commanding or encouraging the commission of that crime; and

Third, acted with the intention of causing the crime charged to be committed.

Before the defendant may be found guilty as an aider or an abettor to the crime, the Government must also prove beyond a reasonable doubt that someone committed each of the essential elements of the offense charged, as detailed for you in the instructions for the crime the defendant is alleged to have . . . aided and abetted.

Merely being present at the scene of the crime, or merely knowing that the crime is being committed or is about to be committed, is not sufficient conduct for the jury to find that a defendant aided and abetted the commission of that crime.

The Government must prove that the defendant knowingly and deliberately associated himself with the crime in some way as a participant, someone who wanted the crime to be committed, not as a mere spectator.

12

Tr. at 3327-29. With respect to Section 924(c), the district court gave the following instructions regarding a charge against Martinez in connection with a different murder:

Section 924(c) of Title 18 of the United States Code provides in pertinent part:

Any person who during and in relation to any crime of violence or drug trafficking crime for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who in furtherance of any such crime possesses a firearm, shall be guilty of a crime.

In order to prove the crime charged in [this count], the government must establish the following two elements beyond a reasonable doubt:

First, that the defendant committed a crime of violence;

And second, that the defendant either knowingly and intentionally used or carried a firearm during and in relation to the commission of the crime of violence, or knowingly and intentionally possessed a firearm in furtherance of that crime, or aided and abetted another person doing so.

[This count] also charges the defendant with violating Section 2 of Title 18 of the United States Code, that is with aiding and abetting the violation of Section 924(c) of Title 18 of the United States Code. In determining whether or not a defendant is guilty as an aider and abettor, you should follow the instructions I have briefly given you.

. . .

To prove that the firearm was used or carried during and in relation to the commission of a crime of violence, the government must prove that it was an integral part of the commission of the crime and that it furthered or facilitated the crime; it is not sufficient if the carrying was inadvertent, coincidental, or for some purpose other than furthering or facilitating the crime.

. . .

To possess a firearm in furtherance of a crime means that the firearm helped forward, advance or promote the commission of the crime. The mere possession of the firearm at the scene of the crime is not sufficient. The firearm must have played some part in furthering the crime.

Tr. at 3390-94. Later, addressing Count 21, the court instructed:

Now, Count 21: Use of a firearm, also charged with aiding and abetting.

Count 21 charges the defendants Martinez and Ortega with the unlawful use of a firearm in connection with Counts 19 and 20 [which are the conspiracy to murder Quijada and the murder of Quijada for purposes of maintaining and increasing position in the MS-13].

Count 21 reads as follows:

[] On or about March [17], 2010,[2] within the Eastern District of New York, the defendant Heriberto Martinez, also known as

---

[2] The district court initially stated "March 6, 2010," but then corrected itself, stating, "There was an error. When I read you the indictment I . . . said on or

14

"Boxer," and Carlos Ortega, also known as "Silencio" and "Silent," together with others, did knowingly and intentionally use and carry a firearm during and in relation to one or more crimes of violence, to wit: the crimes charged in Counts 19 and 20, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished.

I have previously instructed you on the law concerning the use of a firearm during a crime of violence. Again, those instructions apply equally here.

Count 21 also charges the defendants with violating Section 2 of the United States code; that is, with aiding and abetting the violation of Section 924(c) of Title 18 of the United States Code.

In determining whether a defendant is guilty as an aider and abettor, you should follow the instructions that I have previously given you.

Tr. at 3432-33.

## DISCUSSION

### I. Standard of Review

"We review challenges to jury instructions *de novo* but will reverse only where the charge, viewed as a whole, demonstrates prejudicial error." *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015) (internal quotation marks omitted). "A jury instruction is erroneous if it misleads the jury as to the correct

about March 6th. The indictment says on or about March 17th, which is correct." Tr. at 3434.

15

legal standard or does not adequately inform the jury on the law." *United States v. Bahel*, 662 F.3d 610, 634 (2d Cir. 2011) (internal quotation marks omitted).

Generally speaking, if a defendant did not object to the instruction, a "plain error standard of review applies." *United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013). Under that standard, "an appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (alterations and internal quotation marks omitted).

## II.     The Jury Instructions were Plainly Erroneous

Following the trial and the district court's ruling on the defendants' post-trial motions, the Supreme Court decided *Rosemond v. United States*, 134 S. Ct. 1240 (2014). Rosemond, the defendant, was convicted of aiding and abetting a violation of 18 U.S.C. § 924(c). The district court instructed, with respect to 18

16

U.S.C. § 2, that "[a] person who aids or abets another to commit an offense is just as guilty of that offense as if he committed it himself. And in order to aid or abet, the defendant must willfully and knowingly associate himself in some way with the crime, and seek by some act to help make the crime succeed." *Id.* at 1244 (citation, alterations, and internal quotation marks omitted). When discussing § 924(c) specifically, the district court instructed the jury "that it could convict if (1) the defendant knew his cohort used a firearm in the drug trafficking crime, and (2) the defendant knowingly and actively participated in the drug trafficking crime." *Id.* (internal quotation marks omitted).

The Supreme Court vacated Rosemond's conviction, holding that the jury instructions were erroneous. The Court ruled that "[a]n active participant in a drug transaction has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun. In such a case, the accomplice has decided to join in the criminal venture, and share in its benefits, with full awareness of its scope—that the plan calls not just for a drug sale, but for an armed one." *Id.* at 1249. "For all that to be true . . . the § 924(c) defendant's knowledge of a firearm *must be advance knowledge—or otherwise said, knowledge*

17

*that enables him to make the relevant legal (and indeed, moral) choice.*" *Id.* (emphasis added). "[W]hen an accomplice knows nothing of a gun until it appears at the scene, he may already have completed his acts of assistance; or even if not, he may at that late point have no realistic opportunity to quit the crime. And when that is so, the defendant has not shown the requisite intent to assist a crime involving a gun." *Id.* Thus, the Court concluded, "[w]hat matters for purposes of gauging intent, and so what jury instructions should convey, is that the defendant has chosen, with full knowledge, to participate in the illegal scheme." *Id.* at 1250.

"Under these principles," the Supreme Court concluded, "the District Court erred in instructing the jury, because it did not explain that Rosemond needed advance knowledge of a firearm's presence." *Id.* at 1251. The Court found error because "[i]n telling the jury to consider merely whether Rosemond 'knew his cohort used a firearm,' the court did not direct the jury to determine *when* Rosemond obtained the requisite knowledge. So, for example, the jury could have convicted even if Rosemond first learned of the gun when it was fired and he took no further action to advance the crime." *Id.* at 1251-52. The Court

18

emphasized that the jury must be instructed that Rosemond "had to have advance knowledge, of the kind . . . described, that a confederate would be armed." *Id.* at 1252. The Supreme Court also rejected the government's argument that the instruction "looks more accurate when viewed in context," referring to the "umbrella instruction that to aid or abet a crime, a defendant must willfully and knowingly seek by some act to help make the crime succeed." *Id.* (alteration and internal quotation marks omitted). The Court rejected this rationale because that statement "is . . . pitched at a high level of generality" and was immediately followed by the "two-pronged test noted above," and therefore the umbrella statement could not "have cured the court's error." *Id.*

In the wake of *Rosemond*, two circuits, the Sixth and the Tenth, have considered whether umbrella aiding and abetting instructions like those given in the court below are plainly erroneous, and have come to different conclusions. The Sixth Circuit has rejected jury instructions that require a finding only of intent to further the predicate crime, not the use of the gun, and where "[t]he court never instructed the jury that [the defendant] had to have *advance knowledge* that a (real) firearm would be used." *United States v. Henry*, 797 F.3d 371, 374 (6th

19

Cir. 2015) (holding the jury instructions erroneous because they permitted the jury to convict the defendant of violating Section 924(c) "merely because he 'intend[ed] to help commit or to encourage' the predicate offense—the bank robbery—without ever finding that he had the requisite intent and advance knowledge related to his compatriot's firearm possession"); *see also United States v. Richardson*, 793 F.3d 612, 631 (6th Cir. 2015) (holding jury instructions erroneous where, under a natural reading, they required the jury to find only that the defendant intended to help commit the predicate robbery crime because they "insufficiently explain[ed] the knowledge requirement necessary to convict [the defendant] of aiding and abetting a § 924(c) violation").

By contrast, the Tenth Circuit found jury instructions not plainly erroneous where the instructions stated that the government must prove that the "defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about," meaning that he "*consciously shared the other person's knowledge of the underlying criminal act and intended to help him or her*." *United States v. Davis*, 750 F.3d 1186, 1192 (10th Cir. 2014), *cert. denied*, 135 S. Ct. 989 (2015). Although the

Tenth Circuit noted that "[a]fter *Rosemond*, a jury instruction on aiding and abetting § 924(c) should address the defendant's advance knowledge of the gun," and the jury instructions in that case failed to "highlight this point in relation to the § 924(c) offense," it nonetheless held that the blanket aiding and abetting instruction did not fail on plain error review. *Id.* at 1193. Instead, the Tenth Circuit held that "the general aider-and-abettor instruction did require [the defendant] to consciously share [his confederate's] knowledge of the § 924(c) offense and that is enough on a plain error challenge." *Id.*

The instructions given here fall somewhere between those rejected by the Sixth Circuit and those accepted by the Tenth Circuit. Here, the jury was instructed that, in order to convict, it must find that the defendants intended to commit the charged crime, not just the predicate offense, but there was no instruction that the jury was required to find that they consciously shared the knowledge of the principal. We conclude that these instructions are erroneous under *Rosemond* because they provide no instruction that the jury must find that the defendants had *advance knowledge* of the gun at a time that they could have chosen not to participate in the crime. The instructions thus permitted the jury to

21

convict defendants of the crime even if they "kn[ew] nothing of a gun until it appear[ed] at the scene," and even if, at the time they learned about the gun, they had already completed their assistance or had "at that late point no realistic opportunity to quit the crime." *Rosemond*, 134 S. Ct. at 1249. Indeed, in *Rosemond*, the district court specifically instructed that the jury must find that the defendant had knowledge of the firearm, *id.* at 1244, but the Supreme Court nonetheless found this instruction insufficient because it failed to emphasize *when* the knowledge arose. And, the Supreme Court held, this lack of emphasis on the timing was not rectified by the blanket instruction that "to aid or abet a crime, a defendant must willfully and knowingly seek by some act to help make the crime succeed." *Id.* at 1252 (alteration and internal quotation marks omitted). Similarly, here, the blanket aiding and abetting instruction requiring a finding of intent to commit the crime does not cure the failure to require the jury to find that defendants had advance knowledge of the firearm. We therefore hold this jury instruction to be plainly erroneous.

## III. Remedy

Having found that the jury instructions were plainly erroneous, we next address whether the error affected Martinez's and Ortega's substantial rights. To satisfy this requirement, "an appellant must demonstrate that the error was prejudicial." *United States v. Marcus*, 628 F.3d 36, 42 (2d Cir. 2010). "In the ordinary case, an error is prejudicial where there is a 'reasonable probability that the error affected the outcome of the trial.'" *Id.* (quoting *Marcus*, 560 U.S. at 262).

The Second Circuit has previously employed a "modified plain error" rule where an error results from a supervening change in law. In *United States v. Viola*, 35 F.3d 37 (2d Cir. 1994), *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52 (1997), we held that "[w]hen a supervening decision alters settled law, the three . . . conditions for reviewing plain error under Rule 52(b) still must be met, but with one crucial distinction: the burden of persuasion as to prejudice (or, more precisely, lack of prejudice) is borne by the government, and not the defendant." *Id.* at 42. However in *Johnson v. United States*, 520 U.S. 461 (1997), the Supreme Court addressed that scenario and applied the plain error rule, not the modified plain error rule. *Id.* at 469-70. Following *Johnson*, this Court has

23

expressed doubt regarding the continued viability of the modified plain error rule, but has, to this point, declined to address the issue head on. *See, e.g., United States v. George*, 779 F.3d 113, 117 n.2 (2d Cir. 2015) (declining to address "whether the modified plain error standard remains viable in light of *Johnson*"); *Botti*, 711 F.3d at 309-10. Because the outcome is the same regardless of whether the government or defendants bear the burden of persuasion, we need not decide definitively here whether *Johnson* sounded the modified plain error rule's death knell.

Even if an error in jury instructions affected defendants' substantial rights, vacating and remanding the convictions on the count in question is not automatic. *See* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights *may* be considered even though it was not brought to the court's attention." (emphasis added)). That is, if the jury "instruction contains (1) error, (2) that is plain, and (3) that affects substantial rights . . . a court may exercise its discretion to correct the error only if the error seriously affected the fairness, integrity or public reputation of judicial proceedings." *Botti*, 711 F.3d at 308 (brackets, alterations, and internal quotation marks omitted). "An error may 'seriously

24

affect the fairness, integrity or public reputation of judicial proceedings'

independent of the defendant's innocence." *United States v. Olano*, 507 U.S. 725,

736-37 (1993). "Conversely, a plain error affecting substantial rights does not,

without more, satisfy [this requirement], for otherwise the discretion afforded by

Rule 52(b) would be illusory." *Id.* at 737. In applying this final requirement, the

Supreme Court has "suggested that, in most circumstances, an error that does

not affect the jury's verdict does not significantly impugn the fairness, integrity,

or public reputation of the judicial process." *Marcus*, 560 U.S. at 265-66 (internal

quotation marks omitted). *See also United States v. Nouri*, 711 F.3d 129, 140 (2d Cir.

2013) ("If the evidence bearing on the omitted element is overwhelming and

essentially uncontroverted, there is no basis for concluding that the error

seriously affects the fairness, integrity, or public reputation of judicial

proceedings." (internal quotation marks omitted)).

**A.  Ortega**

The question here is whether, had the jury been properly instructed that it

was required to find that Ortega joined in the criminal venture with full

knowledge of its scope, including with advance knowledge of the gun at a time

Ortega could have withdrawn from the scheme, there is a reasonable probability that the jury would have acquitted Ortega on this count. *Cf. United States v. Robinson*, 799 F.3d 196, 201 (2d Cir. 2015) (holding that the defendant's plea to a charge of aiding and abetting a violation of § 924(c) had a sufficient factual basis in light of *Rosemond*, based on the defendant's concession during the plea colloquy that he "had a chance to 'turn[] and run[] the other way' but did not" upon learning that his confederate was using a gun during a carjacking (alterations in original)).

As discussed above, there is evidence that Ortega was in possession of a gun earlier on the day of the murder when he, with others, took Quijada on a mission to find rival gang members to kill. In particular, a cooperating witness testified that, upon their return, Ortega "said that he had wanted to give [Quijada] the gun, but [Quijada] didn't want to pick it up." Tr. at 1776. Further, there was evidence that the gun Ortega had earlier in the day was the same gun Amaya later used to attempt to shoot Quijada. A cooperating witness testified that when the group took Quijada out to search for rival gang members, they carried a silver .22 caliber handgun, which belonged to CLS, Martinez's clique.

26

Another cooperating witness testified that the .22 caliber gun Amaya used at the beach was the same weapon that Quijada was supposed to use against the rival gang members.

However, there is no direct evidence that Ortega knew, upon leaving to pick Quijada up the second time, that someone had brought the gun. The only evidence indicating that Ortega knew about the gun was that after the group left Amaya's house, they spent approximately ten to fifteen minutes in the parking lot outside before going to get Quijada. A cooperating witness testified that he could see the car sitting in the parking lot, and stated, "I don't know what they were doing. I think they were loading the gun." Tr. at 1778. However, this is pure speculation. And while officers later found bullets in the car, this does not prove that the cooperating witness's speculation was accurate. Moreover, there is some evidence—though there is much more evidence to the contrary—that, prior to leaving, the defendants had only decided to give Quijada a beating, and that it was not until they were at the beach that they decided to murder him. Finally, there is no evidence that Ortega continued to participate in the crime after the gun appeared on the beach.

27

Thus, because there is very limited evidence of advance knowledge of the gun or of Ortega's participation in the crime after the gun's appearance on the beach, there is a reasonable probability of a different trial outcome had the jury been properly instructed.[3] "We also believe, again under these circumstances and for the same reasons, that the error 'seriously affect[ed] the fairness' of the proceeding below and exercise our discretion to correct it, having found the error to satisfy the plain error test." *United States v. Draper*, 553 F.3d 174, 182-83 (2d Cir. 2009) (alteration in original) (quoting *Olano*, 507 U.S. at 736). We therefore vacate Ortega's conviction on Count 21.

**B.    Martinez**

The evidence against Ortega in large part also applies to Martinez. There is evidence that Martinez was with Ortega, Quijada, and others, earlier in the day,

---

[3] However, to the extent that Ortega brings a separate sufficiency of the evidence challenge against his conviction on Count 21, this challenge fails. Although there is a substantial possibility that the jury would have come to a different verdict had it been properly instructed, there was certainly sufficient circumstantial evidence that Ortega had foreknowledge of the gun to sustain the conviction. *See Lynch v. Dolce*, 789 F.3d 303, 318 (2d Cir. 2015) (holding that although the "evidence at trial was sufficient to convict," "it was not so overwhelming that there [was] no reasonable possibility that the failure to charge the jury on the possession requirement affected its verdict on that count").

when Ortega possessed the gun in question and tried to give it to Quijada, although there is also evidence that Martinez did not accompany them on this mission. Martinez also returned to Amaya's home to discuss Quijada's fate. Before leaving to get Quijada for the second time, Martinez took a machete from Amaya's home. Martinez was also in the car that sat in the parking lot outside Amaya's house for ten to fifteen minutes before leaving to pick up Quijada. And, although there is evidence that the gun belonged to CLS, the clique Martinez was a leader of, there is no evidence that Martinez knew where the gun was at all times.

However, unlike against Ortega, there is also direct evidence of Martinez's participation in the murder. At the beach, Amaya took out the gun and attempted to shoot Quijada, but the gun jammed. Martinez gave a statement to police saying that after the gun jammed, he hit Quijada with the machete and that he kicked Quijada so that he fell and could not escape. There is also evidence that, after the gun jammed, Amaya handed the gun to Martinez, and Martinez gave Amaya the machete, which Amaya then used to stab Quijada.

29

As to Martinez, we cannot say that there is a reasonable probability of a different outcome at trial had the jury been properly instructed. The evidence demonstrates that, after the gun appeared, Martinez continued to play an active role in the crime. *See Rosemond*, 134 S. Ct. at 1250 n.9 (noting that a jury could "permissibly infer from [a defendant's] failure to object or withdraw that he had . . . knowledge" of the gun at a point where he could walk away). Not only did Martinez hit the victim with a machete and kick him so that he could not run away, Martinez handed Amaya the machete, the murder weapon, after Martinez knew that the gun had been brandished and had malfunctioned. Martinez therefore continued to play a pivotal role in the offense, even after he knew that brandishing a firearm had played a part in it. Further, if Martinez had objections to the use of the gun, moral, tactical, or otherwise, as the leader of the clique, he could have called the crime off or ended his participation in it after the gun was brandished and, especially, after the gun jammed. Unlike the potentially unarmed Rosemond, who might have suddenly learned in the middle of the drug deal that his accomplice had brought a gun, which might well have been turned on him had he tried to bail out of the crime, the evidence here shows that

30

Martinez was armed with a machete, while his coconspirator Ayala had a non-operable firearm. Rather than opt out of the crime, Martinez traded the machete for the gun. Based on this evidence, there is no reasonable probability of a different trial outcome had the jury been properly instructed. Accordingly, we affirm Martinez's conviction on Count 21.

**CONCLUSION**

For the foregoing reasons, and for the reasons stated in the accompanying summary order, (1) the judgment against Martinez is AFFIRMED, (2) with respect to Ortega, we VACATE his conviction on Count 21, AFFIRM his conviction on all other counts, and REMAND for resentencing, (3) we GRANT attorney John F. Carman's motion to be relieved as counsel to Espinal, we DISMISS Espinal's appeal of his conviction and term of imprisonment, and we AFFIRM his special assessment and term of supervised release, and (4) we GRANT attorney Robert A. Soloway's motion to be relieved as counsel to Herrera-Umanzor and we AFFIRM the judgment against Herrera-Umanzor.

31